# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

STEVE ELLIOT, GLENDA ELLIOT,
HUNTER ELLIOT, NATHAN ELLIOT,
and MEGAN ELLIOT,

                Plaintiffs,                Case No. 04-74817

v.                                        Hon. Gerald E. Rosen

JOSHUA LATOR and SCOTT TAYLOR,

                Defendants.

_____/

## OPINION AND ORDER REGARDING
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     June 28, 2006    

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I.  INTRODUCTION

Plaintiffs Steve and Glenda Elliot and their three children, Hunter, Nathan, and

Megan, commenced this suit in this Court on December 9, 2004, alleging that the

Defendant Michigan State Police troopers, Joshua Lator and Scott Taylor,[1] violated their

federal constitutional rights and committed the state-law torts of assault and battery, false

arrest, and false imprisonment by entering their home on February 22, 2004 pursuant to

---

[1]The State of Michigan also was named as a defendant in the initial complaint, but the
parties stipulated to the State's dismissal, and also stipulated to the dismissal of Plaintiffs' claims
against the defendant state troopers in their official capacities.

an allegedly invalid search warrant and then using excessive force and otherwise behaving unlawfully once inside the residence.  By motion filed on December 13, 2005, Plaintiffs now seek summary judgment in their favor, primarily on the grounds (i) that the search warrant was not issued upon a proper showing of probable cause, and (ii) that no reasonably competent police officer in Defendants' position could have concluded that the application for the search warrant established probable cause to search Plaintiffs' residence.[2]

The Court held a hearing on Plaintiffs' motion on June 1, 2006.  For the reasons stated at the time and set forth at greater length below, the Court indicated at the conclusion of the June 1 hearing that Plaintiffs were entitled to summary judgment in their favor as to at least one of their federal constitutional claims.  Specifically, the Court found (i) that the search warrant pursuant to which the Defendant state troopers searched Plaintiffs' residence was not supported by a proper showing of probable cause to believe that contraband or evidence of a crime would be found at this location; and (ii) that the Defendant troopers could not rely upon a magistrate's issuance of this search warrant as a ground for qualified immunity, where the application in support of the warrant was "so

---

[2]Defendants failed to timely respond to this motion.  Instead, on May 30, 2006 — less than 48 hours before the scheduled hearing on Plaintiffs' motion, and over four months after the deadline for a response had passed — Defendants filed (i) a motion for an extension of time within which to file a response, and (ii) a proposed response to Plaintiffs' motion.  As indicated at the hearing on Plaintiffs' motion, and as further discussed below, the Court has elected to consider Defendants' untimely response, but has nonetheless concluded that the arguments advanced in this submission are largely without merit.

lacking in indicia of probable cause as to render official belief in its existence

unreasonable." <u>Malley v. Briggs</u>, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1098 (1986).

Following these rulings concerning the lawfulness of Defendants' initial entry into

Plaintiffs' home, the Court questioned counsel regarding the issues, if any, that remained

to be decided in order to resolve Plaintiffs' remaining federal and state-law claims against

the Defendant troopers.  When counsel were unable to address this question to the

Court's satisfaction at the June 1 hearing, they were invited to file supplemental briefs

within one week of this hearing in which they expressed their views as to the

ramifications of the Court's rulings to Plaintiffs' remaining claims.

The Court has now reviewed these supplemental submissions, and has found them

largely unhelpful to its inquiry.  Plaintiffs' supplemental brief is devoted almost entirely

to the unremarkable and essentially uncontroverted proposition that Defendants may be

held liable for all damages that flowed as a natural consequence from their initial,

unlawful entry into Plaintiffs' home.  This argument regarding the proper measure of

damages for an unlawful entry, however, says nothing about how the Court's rulings at

the June 1 hearing might affect the ***other*** federal and state-law theories of liability

advanced in Plaintiffs' complaint.  Defendants' supplemental brief is only slightly more

illuminating on this subject,[3] arguing (i) that the detention of Plaintiffs during the

---

[3]Predictably, Defendants' brief was filed two days after the one-week deadline announced at the June 1 hearing, in keeping with defense counsel's consistent failure to comply with the pertinent time limits for submissions to the Court.

3

execution of the search warrant was reasonable, and did not rise to the level of a full-blown arrest, and (ii) that outstanding issues of fact preclude a determination as a matter of law in Plaintiffs' favor on their claim of excessive force.

Thus left largely to its own devices, the Court has reviewed the case law that governs Plaintiffs' remaining federal claims — in particular, their Fourth Amendment claims of unlawful seizure and excessive force.[4]  As discussed below, this analysis leads to the conclusion that Plaintiffs are entitled to summary judgment in their favor as to most aspects of these two federal constitutional claims, with only certain narrow issues of liability and the matter of damages remaining for determination in a future proceeding. In addition, the Court takes this opportunity to describe in somewhat greater detail the grounds for its award of summary judgment to Plaintiffs on their Fourth Amendment claim of an unlawful initial entry into their home.

## II.  <u>FACTUAL BACKGROUND</u>

The challenged search and related incidents in this case stem from an investigation into the circumstances surrounding the reported armed robbery of a non-party, Andrew Anderson, at around 10:00 p.m. on Saturday, February 21, 2004.  At the time, Anderson was at the home of Joshua Kerns, located in the small town of Harrison in Clare County,

---

[4]The Court recognizes that Plaintiffs also have advanced state-law claims of assault and battery, false arrest, and false imprisonment.  These claims, however, were addressed in only a perfunctory fashion in Plaintiffs' initial summary judgment motion, and are barely mentioned in their supplemental brief.  Accordingly, the Court declines to address these claims at this juncture.

Michigan.[5]  After he was robbed, Anderson called his mother, who picked him up from

Kerns's residence and drove him to her home (also in Harrison).  From there, Anderson

and/or his mother called 911 shortly after midnight on Sunday, February 22, 2004, and

the Defendant state troopers, Joshua Lator and Scott Taylor, were dispatched to handle

the call.[6]

Upon meeting with Anderson, the troopers were told that the armed robbery

stemmed from a year-and-a-half old financial dispute regarding an engine repair job that

Anderson had promised but never delivered.  During the course of this interview, the

troopers' inquiry quickly focused on two individuals, Billy Fox and Ronnie McClure, as

the apparent perpetrators of the armed robbery.  Trooper Taylor began conducting

surveillance on the suspected residence of Billy Fox, while Trooper Lator began

investigating other locations where Fox or McClure might be found.  As part of this

investigation, Lator contacted a number of law enforcement agencies, including the Clare

County Sheriff's Department and the Bay Area Narcotics Enforcement Team

---

[5]Because all of the relevant events in this case occurred in Clare County, venue should
have been placed in the Northern Division of this District in Bay City.  Plaintiffs' civil cover
sheet presumably contributed to this error, as it confusingly states (i) that Plaintiffs reside in
Isabella County (which also would trigger assignment to the Northern Division), but (ii) that the
action arose in Oakland County.  Since absolutely nothing of relevance to this case occurred in
the latter county, one perhaps could assume that Plaintiffs' counsel erroneously referred to the
Oakland County location of his own office — a fact which, of course, has no bearing on a
determination of proper venue.  Nonetheless, Defendants failed to note this defect in their answer
or their initial Rule 12 motion.  Thus, Defendants have waived any challenge to improper venue.

[6]The troopers evidently were assigned to handle this call because the only available unit
from the Clare County Sheriff's Department was tied up with another matter.

5

("BAYANET").[7]  As a result of his investigation, Trooper Lator identified a number of locations where Fox, McClure, the gun, or the stolen money might be found.

Armed with this information, Lator met with Clare County prosecutor Norm Gage. During this meeting, Lator received a call from Detective Craig Wilson of BAYANET.[8] According to the trooper, Detective Wilson told him that Plaintiffs' residence at 655 N. First Street in Harrison[9] was "a place he had known . . . Ronnie McClure to frequent and that he believed the McClure family had lived there prior to that occasion." (Lator Dep. at 62.)  More generally, Detective Wilson conveyed to Lator that "he had had multiple prior contacts with both Fox and McClure and that [Plaintiffs' home] would be a possible residence where . . . McClure would have either been hiding or possibly hid the weapon." (Id. at 63.)  When Trooper Lator was asked at his deposition if he had inquired where Detective Wilson had obtained this information, the trooper responded that Wilson's information "was based on his personal experience with Mr. Fox and Mr. McClure and his personal knowledge having been a deputy in Clare County working that area" who was "very familiar with the Enchanted Rock."  (Id.)  Although Wilson did not provide a

---

[7]Although the record is not entirely clear as to why these other agencies were contacted, Trooper Lator's incident report discloses, and his deposition testimony confirms, that Anderson indicated during his interview with the troopers that methamphetamine usage might somehow have been involved in the armed robbery incident.

[8]Detective Wilson evidently was employed at the time by the Saginaw Chippewa Indian Tribe, but he previously had worked for the Clare County Sheriff's Department.

[9]The parties occasionally refer to Plaintiffs' residence as the "Enchanted Rock," as a jewelry store by that name previously had been operated out of the lower level of the premises.

6

time frame in which he had acquired this information, Lator believed that the detective, as a BAYANET member, "had current knowledge of the possible drug use and locations of known drug dealers and also that he had prior contacts with McClure and Fox." (Id. at 64.)

At his deposition, however, Detective Wilson provided a somewhat different (and considerably more vague) account of the basis for the information he supplied to Trooper Lator. In particular, he denied any personal or first-hand knowledge that McClure resided at or frequented the 655 N. First Street location, and instead testified that this information had been "obtained over a course of time" in his role on the BAYANET team. (Wilson Dep. at 24.) Beyond this, Wilson was unable to identify either the source(s) of this information or the time frame in which it might have been acquired. Wilson acknowledged, for example, that this information could have been learned in part from an informant,[10] and he conceded that he did not know whether this information was recent or more than a year old. (See id. at 29, 36.) More generally, Wilson described the information he conveyed to Trooper Lator during their telephone conversation as "pooled information" that had been gathered from some combination of "informants," "people on the street," and "other officers on the scene" of the current investigation. (Id. at 23.)

---

[10]Notably, while Trooper Lator testified at his deposition that the source of his information regarding Plaintiffs' residence was the personal knowledge of Detective Wilson, his contemporaneous incident report refers to "confidential source information from an unrelated incident that Ronnie Mcclure was residing part time at 655 First Street." (Defendants' Response, Ex. A, Lator Incident Report at 5.)

Based on this information, Wilson conveyed to Lator his "belief" that McClure and/or Fox "sometimes hung out" at 655 N. First Street, and that "[t]hey were in with the people that we believed to frequent there, to live there," (id. at 33) — although, as he conceded, he did not know that these "people" no longer lived at this address and that Plaintiffs had moved into the home a month or two earlier.  (id. at 33-36.)[11]

Based on the information conveyed to him by Detective Wilson, Trooper Lator added Plaintiffs' residence at 655 N. First Street to the list of five locations for which he intended to obtain search warrants.[12]  In his affidavit in support of the search warrant for Plaintiffs' home, Trooper Lator identified the places to be searched as the "residence, vehicles and outbuildings located at 655 N. First St.," and the person and property to be seized as (i) Ronald William McClure, (ii) any and all currency, (iii) firearms and weapons of any kind, and (iv) proofs of residency and/or articles of domain and control, such as utility bills, correspondence, and the like.  (Plaintiffs' Motion, Ex. E.)  Trooper Lator then set forth the following facts as establishing probable cause to search:

> Your Affiant, Trooper Joshua Lator, is a Trooper with the Michigan State Police based at the Mt. Pleasant Post for the last 5 ½ years.
>
> Your Affiant is part of an ongoing investigation in the armed robbery of Andrew Charles Anderson by William Raymond Fox and Ronald William McClure II on or about 02/21/04 at approximately 2200 hours in the City of

---

[11]According to Plaintiff Steve Elliot, he and his family had moved into the home in November of 2003, or about three months before the incident at issue here.

[12]In addition to these five search warrants, arrest warrants were obtained for Fox and McClure.

Harrison, Clare County, Michigan.

As a result of the information gained through this investigation Felony Warrants have been issued for both William Raymond Fox and Ronald William McClure II for Armed Robbery.

Anderson stated to your Affiant that McClure had an on going dispute with him over the purchase of an engine.  Anderson stated McClure approached him in the home of Joshua Kerns, 445 N. Fourth St., City of Harrison, Clare County, State of Michigan and demanded that he "make the deal right".  Anderson reported that McClure told him he knew he had $600.00 in cash.  Anderson stated that Fox then entered the room revealing a black hand gun tucked in his waistband.  Anderson stated that Fox said "Don't make me rob you."  Anderson stated he was in fear for his life and felt he was being robbed at gun point.  Anderson stated he gave McClure five (5) twenty dollar bills from his pocket.

Through the course of this investigation your Affiant has learned that Ronald McClure II sometimes stays at 655 N. First St., City of Harrison, Clare County, State of Michigan.

(Id.)

Magistrate Rick Labota signed the search warrant for Plaintiffs' residence,[13] and this search warrant was executed at around noon on Sunday, February 22, 2004.  Prior to the execution of this warrant, Fox and McClure both had been taken into custody, and Trooper Lator had interviewed McClure.  Nonetheless, it was determined that all five search warrants should still be executed, in an effort to track down the gun and money involved in the armed robbery.

According to Plaintiffs, in executing the search warrant for their home, Defendants

---

[13]Magistrate Labota testified that he does not have a law degree or a license to practice law.  Rather, his most advanced degree is a bachelor's degree from Central Michigan University, majoring in science.

and the remainder of the raid team (i) failed to wait between knocking at and breaking down the door; (ii) entered the home with weapons drawn and yelled for Plaintiffs Steve and Glenda Elliot and their three young children to get down on the floor, (iii) handcuffed Steve Elliot, (iv) stepped on the hand of Glenda Elliot, (v) destroyed Plaintiffs' furnishings and threw their beds around, and (vi) held the family at gunpoint (and kept Mr. Elliot handcuffed) throughout the entire 45-minute search of the home.  As a result of the search, two registered firearms apparently were seized from Plaintiffs' residence, but no charges were filed against any family member in connection with this incident.

### III.  ANALYSIS

**A.      The Standards Governing Plaintiffs' Motion**

The present motion is somewhat unusual, in that Plaintiffs rather than Defendants are seeking summary judgment in their favor.  Nonetheless, the governing standards are familiar — under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

**B.   Plaintiffs Are Entitled to Summary Judgment in Their Favor on Their Fourth Amendment Claim of an Unlawful Entry into Their Home.**

The principal issue addressed in Plaintiffs' motion concerns the justification — or, in their view, the lack thereof — for the Defendant state troopers and other members of the raid team to enter their home on February 22, 2004 to search for evidence of a crime. As noted earlier, this issue was extensively addressed at the June 1, 2006 hearing, with the Court determining at the conclusion of this hearing that Defendants' entry was unlawful. While the basis for this ruling was set forth at the hearing, the Court reiterates its analysis below to ensure a more complete record on this issue.

**1.   The Warrant to Search Plaintiffs' Home Was Not Supported by Probable Cause.**

Under familiar principles, a search warrant may not issue unless a judge or magistrate determines that, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Mills v. City of Barbourville, 389 F.3d 568, 575-76 (6th Cir. 2004) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "In evaluating the issuing magistrate's probable cause determination, we apply a flexible 'totality of the circumstances' approach, which permits us to evaluate the particular facts of each case." Mills, 389 F.3d at 576. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." 389 F.3d at 576.

11

The crux of the probable cause inquiry here is whether Trooper Lator's affidavit supplied sufficient information to establish a "fair probability" that evidence of the armed robbery of Andrew Anderson would be found at Plaintiffs' residence.  The sum total of this information is found in Trooper Lator's statement that he had "learned" in "the course of [his] investigation" that "Ronald McClure II sometimes stays at 655 N. First St."  On its face, this statement does not indicate (i) the source of this information, (ii) the reliability of this unidentified source, or (iii) how recently McClure might have stayed at this location.  Neither does the affidavit indicate whether any steps were taken to corroborate this information — and, in fact, it is evident from the record that no such corroboration was sought or obtained, whether through surveillance, a record search, or otherwise.[14]  Under these circumstances, the magistrate could not possibly have made a meaningful assessment as to whether the information "learned" by Trooper Lator was sufficiently reliable to support the issuance of a warrant.

The deposition testimony in this case merely confirms the inability, even now, to meaningfully assess the reliability of this information.  While Defendants cite Trooper Lator's belief that the information provided by Detective Wilson was both fresh and based on the detective's own first-hand knowledge, Detective Wilson's deposition testimony conclusively demonstrates that the trooper's belief was wholly unfounded.

---

[14]Some of the other search warrants obtained in connection with the armed robbery investigation, in contrast, evidently were based on such sources as LEIN checks and surveillance.

12

Most significantly, Detective Wilson *flatly denied* that he had first-hand or personal knowledge of a link between McClure and Plaintiffs' residence.  In addition, the detective was unable to identify the source(s) of his information connecting Ronnie McClure to Plaintiffs' residence, nor was he able to provide any sort of assurance that this information was of reasonably recent vintage.

Neither could Detective Wilson discount the possibility that his information was derived, at least in part, from one or more confidential informants.  Yet, it is clear that "anonymous informants generally cannot establish probable cause alone," Hale v. Kart, 396 F.3d 721, 729 (6th Cir. 2005), absent some basis for assessing their reliability — as, for example, through a recitation of a prior track record of reliability — or some corroboration of the information they have provided, see United States v. Helton, 314 F.3d 812, 819-20 (6th Cir. 2003).  It surely follows, in this case, that Trooper Lator's bare statement of information he had "learned" could not establish probable cause to search, where it cannot be said, even under the record compiled during a full course of discovery, that the underlying sources of Detective Wilson's information were reliable — or, indeed, what these sources even *were,* or how far back their information might have dated.  Probable cause cannot meaningfully be determined in this sort of vacuum.

Defendants' other efforts to shore up the magistrate's probable cause determination are equally unavailing.  First, they cite the deposition testimony of prosecutor Gage that the affidavit "[c]ould . . . have been better," but nonetheless met

13

"the basic requirements" of the Fourth Amendment.  Yet, Defendants fail to suggest a basis for this Court to grant any weight to the prosecutor's opinion on this question of law.  In any event, this opinion rested in part upon the prosecutor's "assum[ption]" that the search warrant affidavit must have been sufficient, where neither Fox nor McClure challenged the search warrant or affidavit in the criminal proceedings brought against them.  Nowhere do Defendants endeavor to explain, however, why Fox or McClure (i) would have had standing to challenge the search of Plaintiffs' home, or (ii) would have had any incentive to do so, when this search evidently did not uncover any evidence that could be used against them.

Finally, Defendants cite the deposition testimony of the magistrate who issued the warrant.  Again, however, the legal significance of this testimony is unclear.  In any event, in one of the very passages cited by Defendants, the magistrate agrees that he would have wanted to know if Trooper Lator's information had come from a confidential informant.  Since Detective Wilson was simply unable to say *where* he had learned the information that linked McClure to Plaintiff's residence, and was unable to discount the possibility that this information might have come, in whole or in part, from one or more confidential informants, the magistrate's testimony surely provides no assistance in Defendants' effort to explain how Trooper Lator's affidavit established probable cause to search Plaintiffs' home.  Accordingly, the Court reaffirms its ruling at the June 1 hearing that Trooper Lator's application and affidavit did not provide a sufficient basis for the

14

issuance of a warrant to search Plaintiffs' residence.

> **2.      Defendants Are Not Entitled to Qualified Immunity as to the Lawfulness of Their Entry into Plaintiffs' Home, Where No Reasonable Officer in Their Position Could Have Believed that Probable Cause Existed to Search Plaintiffs' Residence.**

Although Trooper Lator's affidavit did not establish probable cause to search Plaintiffs' residence, Defendants still may appeal to qualified immunity as a potential shield against liability for their execution of the flawed search warrant. As a general matter, of course, qualified immunity shields a governmental defendant from liability under 42 U.S.C. § 1983 for a federal constitutional violation unless "the violation involves clearly established constitutional rights of which a reasonable person would have known." Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002) (internal quotation marks and citations omitted). In the specific context of a claim that a police officer secured a warrant through an application and supporting affidavit that failed to establish probable cause, the Supreme Court has held that the defendant officer forfeits his qualified immunity "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Malley v. Briggs, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1098 (1986).

Accordingly, Plaintiffs are entitled to summary judgment in their favor only if they can demonstrate, as a matter of law, that it was objectively unreasonable for the Defendant troopers to believe that the search warrant issued by the magistrate rested upon a proper showing of probable cause to search Plaintiffs' residence. See Hale, 396 F.3d at

15

724-25.  In light of this additional latitude conferred upon defendant police officers under the qualified immunity standard, there can be cases in which a warrant application does not, in fact, establish probable cause to search or arrest, but where it is nonetheless objectively reasonable for a police officer to believe otherwise.  See United States v. Carpenter, 360 F.3d 591, 595 (6th Cir. 2004).  "Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." United States v. Washington, 380 F.3d 236, 241 (6th Cir. 2004).

Although Defendants maintain that Trooper Lator's affidavit itself established probable cause to search Plaintiffs' home, they contend in the alternative that it was not objectively unreasonable for them to believe that the search warrant rested upon a showing of probable cause.  Yet, to the extent that this contention rests upon statements within the four corners of Trooper Lator's affidavit, any such belief surely was objectively unreasonable.  On the critical point as to a possible nexus between Ronnie McClure and Plaintiffs' residence, the trooper's affidavit states only that he had "learned" that McClure "sometimes stays" there.  While Trooper Lator has testified as to his belief that this information rested upon Detective Wilson's personal knowledge — and even here, of course, his affidavit at the time did not identify this ground for deeming the information reliable — the record lacks any evidence (i) that the detective actually had any such personal knowledge of a connection between McClure and Plaintiffs' residence, or (ii) that Trooper Lator had any basis, beyond pure supposition, to believe that the

16

detective had personal knowledge on this subject.  If an officer could be deemed to have acted objectively reasonably whenever he subjectively forms a mistaken and unfounded belief that the information set forth in a warrant application is sufficiently fresh and reliable to support a finding of probable cause, this would effectively reward an officer who conducts little or no investigation or inquiry as to the underlying sources of the information cited in a warrant application.  Defendants have not cited any authority for this proposition, nor is the Court aware of any.

Defendants' principal argument, however, is that they acted objectively reasonably in light of the ***additional information*** that they knew but did not convey in the search warrant application.  As an initial matter, it is open to question whether the Court may properly consider such additional information in conducting its qualified immunity analysis — and Defendants, predictably, have not cited any authority for this proposition. Malley arguably suggests that such additional information may ***not*** be considered, where the Supreme Court in that case stated that the inquiry should focus upon whether "***the warrant application*** is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."  Malley, 475 U.S. at 344-45, 106 S. Ct. at 1098.  Yet, the Sixth Circuit has stated, albeit without discussion or explicit consideration of this point, that the qualified immunity inquiry should focus on "the facts . . . known to [the defendant officer] when he sought the warrant."  Hale, 396 F.3d at 725.[15]  Thus, the Court

_____

[15]In the related context of a Leon "good faith" analysis, the *en banc* Sixth Circuit elected to "leave for another day" the question whether the Leon exception is available in cases where

will assume, for present purposes, that the "additional information" cited by Defendants

may properly be considered in a qualified immunity analysis.

Nonetheless, Defendants' appeal to "additional information" suffers from at least

two fundamental defects.  First, the record fails to establish, in many instances, that

Trooper Lator actually knew the "additional facts" cited by Defendants at the time he

prepared the affidavit in support of the search warrant.[16]  For example, Defendants point

to various "facts" suggesting that prior residents at Plaintiffs' "Enchanted Rock"

premises were involved in "the methamphetamine trade in Harrison," and that the current

owner from whom Plaintiffs leased the premises was "one of the biggest meth dealers in

_____

"the officers had other information that was not presented to the issuing magistrate, but that
would have established probable cause."  Carpenter, 360 F.3d at 597.  More recently, however, a
panel of the court reached this issue, and held that "a determination of good-faith reliance, like a
determination of probable cause, must be bound by the four corners of the affidavit."  United
States v. Laughton, 409 F.3d 744, 751 (6th Cir. 2005).

Accordingly, it is now the law of this circuit, at least in the context of suppression
hearings in criminal cases, that "[w]hether an objectively reasonable officer would have
recognized that an affidavit was so lacking in indicia of probable cause as to preclude good faith
reliance on the warrant's issuance can be measured only by what is in that affidavit."  Laughton,
409 F.3d at 751-52.  It does not necessarily follow, however, that the same standard governs
determinations of qualified immunity in civil cases.  In any event, the recent decision in
Laughton plays no role in ascertaining the "clearly established" law as it existed at the time of
the February 22, 2004 search in this case.

[16]Indeed, certain of these "facts" are not established even under the present record, but
rest solely upon the bare (and occasionally inaccurate) assertions of defense counsel in
Defendants' response to Plaintiffs' motion.  Counsel states, for example, that Plaintiff Steve
Elliot "was involved in the meth trade in California" before he moved to Michigan, and that he
"had a felony conviction relating to methamphetamine in California."  (Defendants' Response at
10.)  In fact, the record indicates that Steve Elliot had a California ***misdemeanor*** conviction for
methamphetamine possession, dating back over ten years prior to the search at issue here.  (See
Steve Elliot Dep. at 25-26.)

18

the city." (Defendants' Response at 10.)[17]  Yet, Defendants have failed to cite any record

evidence indicating that this information purportedly linking Plaintiffs' residence to past

or present methamphetamine dealings was conveyed to Trooper Lator at the time he was

preparing his search warrant affidavit.  The same is true as to Defendants' (largely

baseless) claims that Plaintiff Steve Elliot was "involved in the meth trade in California"

and "had a felony conviction relating to methamphetamine in California."  (Defendants'

Response at 10.)  Indeed, it does not appear that Trooper Lator made any effort at the

time to determine who presently lived at 655 N. First Street, much less investigate the

criminal background of these present occupants.  Finally, while Defendants point to

evidence that the robbery victim, Andrew Anderson, and perhaps also his mother had

identified the Enchanted Rock as Ronnie McClure's place of residence, Trooper Lator

***expressly testified*** that Detective Wilson was the sole source upon whom he relied in

linking McClure to Plaintiffs' residence, and he ***specifically denied*** any recollection that

Anderson had told him anything about the Enchanted Rock. (See Lator Dep. at 66, 69-

70.)

     Next, and more importantly, none of these "additional facts" have any possible

bearing upon the relevant question here — namely, whether there was probable cause to

---

[17]Notably, the passages of Detective Wilson's deposition that are cited in support of these
assertions actually include ***no testimony whatsoever*** that the "Enchanted Rock" premises or its
owner were involved in "the methamphetamine trade."  Rather, the detective suggested only that
the premises and its owner had been involved in "criminal endeavors," and he specifically
***denied*** that he had any basis to believe that anyone living at the "Enchanted Rock" premises was
involved in methamphetamine sales or use.  (Wilson Dep. at 30, 34.)

believe that either Ronnie McClure or evidence of his alleged armed robbery might be found at Plaintiffs' residence.  The smokescreen of "facts" offered by Defendants regarding the methamphetamine trade and its possible connection to Plaintiff Steve Elliot or the "Enchanted Rock" premises are ***utterly irrelevant*** to this probable cause determination.  Even the most herculean effort to follow the chain of dubious inferences offered by Defendants would not forge the necessary connection between McClure and Plaintiffs' residence, where (i) despite the fog of innuendo thrown up by Defendants and their counsel, there is ***no record evidence*** that McClure was involved in the methamphetamine trade that purportedly was "center[ed]" at some unspecified past time at the Enchanted Rock premises, and (ii) similarly, there is no record evidence that many or all of the various participants in the Harrison methamphetamine trade were somehow affiliated, such that it might be plausible to infer that one of these participants might be found or might leave his belongings at the residence of another.

In the end, Defendants' argument, if accepted, would lead ineluctably to the conclusion that the police could have obtained a warrant ***at any time*** to search Plaintiffs' residence, based on the purported "facts" linking this location and its current and/or former occupants to the methamphetamine trade.  Even if such a conclusion were warranted under the record (and it most assuredly is not), this would have no bearing upon the ***different*** matter at issue here — namely, whether it was objectively reasonable for the Defendant troopers to believe that probable cause existed to search Plaintiffs'

20

residence for Ronnie McClure and the evidence of his alleged armed robbery. Defendants' "additional facts" are quite simply irrelevant to this question. Accordingly, the Court concludes as a matter of law that qualified immunity is unavailable to shield Defendants from liability for their unlawful entry into Plaintiffs' home.

**C.     In Light of Defendants' Unlawful Entry into Plaintiffs' Home Pursuant to an Invalid Search Warrant, Plaintiffs Are Entitled to Summary Judgment in Their Favor on Their Fourth Amendment Claim of Unreasonable Seizure.**

Turning next to the lawfulness of Defendants' actions once inside Plaintiffs' home, the Court begins with the "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980) (internal quotation marks and footnote omitted); see also United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996). Here, of course, the Defendant state troopers had secured a warrant to search Plaintiffs' home for evidence relating to a third party's armed robbery, but the Court has determined that the application and affidavit in support of this warrant did not establish probable cause to search Plaintiffs' residence. Neither do Defendants claim that their entry into the residence was justified by any exigent circumstance that might have overcome the lack of a valid warrant. See Rohrig, 98 F.3d at 1515 (discussing this "exigent circumstances" exception to the warrant requirement). Accordingly, it is clear, as the Court held at the June 1 hearing and as reiterated above, that Defendants' initial entry into Plaintiffs' home was unlawful.

21

It is only a short step from this ruling to the further conclusion that Plaintiffs were unlawfully "seized" in the immediate aftermath of Defendants' unlawful entry into their home.  The record is clear, and Defendants do not dispute, that Plaintiffs were detained throughout the entirety of the search of their residence, with guns trained upon them and Plaintiff Steve Elliot kept in handcuffs through at least a portion of this search.  This readily qualifies as a "seizure" within the meaning of the Fourth Amendment, as Defendants acknowledge that Plaintiffs were not free to leave at any point during the execution of the search warrant.  See Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968); Burchett, 310 F.3d at 942.  The question, then, is whether this seizure was "unreasonable," in violation of the express language of the Fourth Amendment.[18]

As Defendants point out, the Supreme Court has held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Michigan v. Summers, 452 U.S. 692, 705, 101 S. Ct. 2587, 2595 (1981) (footnotes omitted).  More recently, the Court affirmed that this authority extends to the use of "reasonable force to

---

[18]Because the Fourth Amendment prohibits unreasonable *seizures*, and not merely unreasonable *arrests*, it is immaterial whether, as Defendants contend in their supplemental brief, the detention of Plaintiffs while the state troopers searched their home fell short of a full-blown arrest.  Even assuming this is so, Defendants still could be held liable for an unreasonable "seizure" that was not tantamount to an "arrest."  See Terry, 392 U.S. at 16, 88 S. Ct. at 1877 ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime — 'arrests' in traditional terminology."); Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir. 2003) (evaluating a "seizure[] short of a traditional arrest" under the general Fourth Amendment standard of reasonableness).

22

effectuate the detention," including the "imposition of correctly applied handcuffs" if warranted under the circumstances of the particular search in progress. Muehler v. Mena, 544 U.S. 93, 98-100, 125 S. Ct. 1465, 1470-71 (2005). Thus, Defendants surmise that they were entitled to detain Plaintiffs, and to employ a reasonable amount of force in doing so, while they executed the warrant to search Plaintiffs' residence.

Yet, an important consideration underlying the ruling in Summers — and, indeed, the factor that the Court deemed "[o]f prime importance" — was "the fact that the police had obtained a warrant to search [the defendant's] house for contraband." Summers, 452 U.S. at 701, 101 S. Ct. at 2593. The Court explained:

> A neutral and detached magistrate had found probable cause to believe that the law was being violated in [the defendant's] house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises was searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizens — unless they intend flight to avoid arrest — would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in [the defendant's] own residence, it could add only minimally to the public stigma associated with the search itself . . . .

Summers, 452 U.S. at 701-02, 101 S. Ct. at 2593-94 (footnotes omitted).

This essential predicate to a Summers detention is lacking in this case. To be sure, Defendants had obtained a warrant to search Plaintiffs' residence, but the Court has found that this warrant should not have been issued. Accordingly, there was no legal

23

basis for *any* intrusion into Plaintiffs' home.  See Groh v. Ramirez, 540 U.S. 551, 558,

124 S. Ct. 1284, 1290 (2004) (finding that, while the challenged search in that case was

authorized by a warrant, this warrant was "so obviously deficient that we must regard the

search as 'warrantless' within the meaning of our case law").  Under these circumstances,

it cannot be said that Plaintiffs' detention during the search was only a modest and

necessary *additional* invasion of their right to be left alone, beyond the intrusion that

inevitably results from the execution of a valid warrant.

The courts have recognized that Summers is inapplicable under these

circumstances.  The Seventh Circuit, for example, has observed:

> . . . [W]here a search is illegal and not supported by probable cause,
> the justification for using the search as the foundation for the seizure
> disappears because it was the connection of the individual with a location
> suspected of harboring criminal activity that provided the reasonable basis
> for the seizure.  When there is no longer probable cause to believe criminal
> activity is taking place at the location where an individual is found, the
> mere presence of the individual in that place is no justification for seizing
> that individual.  In that circumstance, the foundation for seizing the
> individual must come from an independent probable cause determination
> that the individual is involved in illegal activity.

Jacobs v. City of Chicago, 215 F.3d 758, 772 (7th Cir. 2000) (citation omitted); see also

Smith v. Stone, 215 F.3d 1327, 2000 WL 687672, at *7 n.4 (6th Cir. May 19, 2000)

(holding that the defendant police officers could not appeal to Summers to justify the

detention of the plaintiffs during a search of their residence because "the police did not

have a valid warrant in this case"); Marks v. Clarke, 102 F.3d 1012, 1032 (9th Cir. 1996)

(stating that Summers does not "authorize detaining the occupants in furtherance of an

illegal search").

Neither does the record disclose any other lawful basis for detaining Plaintiffs during the search of their home pursuant to a facially invalid warrant. Plaintiffs were not suspected of any criminal activity — rather, the stated ground for the warrant was the suspicion, based on information of unknown staleness from unknown sources, that a third party, Ronald McClure, "sometimes stay[ed]" at Plaintiffs' home, and thus might have stored evidence of his alleged armed robbery within this residence. Moreover, while McClure might well have been considered dangerous as a suspected armed robber, he had already been taken into custody by the time the Defendant troopers searched Plaintiffs' home, and the troopers were fully aware that McClure posed no further threat to their safety as they executed the warrant. Finally, there is no evidence, or even a claim, that Plaintiffs took any action or engaged in any conduct that might have given rise to any safety concerns during the execution of the warrant.

Under these circumstances, the Court need not decide whether a limited, Summers-based detention might be justified in a proper case even absent a valid warrant. Such a case presumably would have to feature either (i) an exigency that justified both a warrantless entry into a home and the detention of the occupants while the police addressed this exigency, or (ii) circumstances arising after the unlawful entry that necessitated a detention for the safety of the officers or for other legitimate purposes. Nothing of either sort is discernable in the record here. Consequently, the Court finds

25

that Plaintiffs are entitled to summary judgment in their favor on their claim of an

unreasonable seizure in violation of the Fourth Amendment as a result of their detention

during the search of their home.[19]

**D.      Plaintiffs Also Are Entitled to Summary Judgment in Their Favor on Certain Aspects of Their Fourth Amendment Claim of Excessive Force.**

The foregoing analysis largely dictates the outcome of Plaintiffs' next Fourth

Amendment claim — namely, that the Defendant troopers used excessive force during

their search of Plaintiffs' residence.  This claim, after all, is merely a more specific

variation upon Plaintiffs' overall theory of unlawful seizure, and is governed by the same

"reasonableness" standard that the Court applied above.  See Graham v. Connor, 490

---

[19]There are two caveats to this ruling.  The search of Plaintiffs' home evidently was carried out by a team of officers, and the record is unclear as to the precise roles played by the two named Defendant troopers.  Accordingly, the Court cannot be certain as to the precise extent of the two Defendants' participation in — and, hence, their liability for — the various actions that comprised the unlawful seizures of the five Plaintiffs.

In addition, while Defendant Lator prepared the affidavit in support of the search warrant, the record before the Court does not disclose the extent of Defendant Taylor's involvement in procuring the warrant or his knowledge regarding the matters addressed in Trooper Lator's affidavit.  This leaves open the possibility that Defendant Taylor might be entitled to qualified immunity, if he could be said to have reasonably relied upon the statements of Defendant Lator and other officers regarding the existence of probable cause to search Plaintiffs' home.  See, e.g., Rogers v. Powell, 120 F.3d 446, 453-56 (3d Cir. 1997) (addressing this issue of reasonable reliance on the statements of fellow officers).  This qualified immunity might further extend to Defendant Taylor's role in detaining Plaintiffs during the search of their home, if his actions stemmed from his reasonable (albeit mistaken) belief that such a detention was permissibly grounded in a valid warrant to search Plaintiffs' residence.

The parties have not addressed either of these matters in their submissions to the Court.  Under these circumstances, the Court declines to resolve these issues here, but instead will revisit them in future proceedings under a more complete record.

26

U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989).  Indeed, under the facts of this case,

Plaintiffs' claims of unlawful seizure and excessive force are largely duplicative, since

the force used against Plaintiffs was applied principally, if not exclusively, in aid of their

detention during the course of the search.[20]  Not surprisingly, then, having already

determined as a matter of law that the detention of Plaintiffs was unreasonable, the Court

further concludes that the force employed to effect this detention also was unreasonable.

In challenging Plaintiffs' claim of excessive force, Defendants again appeal to

Muehler, supra, 544 U.S. at 99-100, 125 S. Ct. at 1470-71, for the proposition that police

officers are entitled to use a degree of force, including handcuffing, if warranted under

---

[20]In this regard, the Court recognizes Plaintiffs' apparent point in their supplemental brief
that, irrespective of the precise Fourth Amendment theory of liability that they might be
invoking, Plaintiffs may properly recover from Defendants for any measures they employed
without a legal basis, and any injuries that might have resulted, following the initial entry into
Plaintiffs' home pursuant to a facially invalid warrant.  As Plaintiffs point out, Defendants are
subject to liability for any such injuries that were the natural consequence of their Fourth
Amendment violations, whether these transgressions are characterized as unreasonable seizures
or the excessive use of force.

Nonetheless, the Court cannot agree with Plaintiffs' further contention that the illegality
of the initial entry into their home, without more, subjects Defendants to liability for any injuries
that ensued, regardless of the reasonableness of Defendants' conduct once inside the home.  It
would have been possible, in the Court's view, for Defendants to limit their liability by
conducting themselves differently upon entering Plaintiffs' home — Defendants could have
elected, for example, to forgo any forcible detention of Plaintiffs while executing the search
warrant.  This was the matter that the Court invited the parties to discuss in their supplemental
briefs, but that Plaintiffs (and Defendants) largely failed to address — namely, whether Plaintiffs
were entitled to summary judgment in their favor as to any ***additional*** constitutional or state-law
violations allegedly committed by Defendants upon entering Plaintiffs' home, beyond the Fourth
Amendment violation committed by entering the home pursuant to a warrant issued without
probable cause.  Rather than addressing this question, Plaintiffs instead discussed the proper
measure of damages for a Fourth Amendment violation — a measure which perhaps somewhat,
but not entirely, obviates the need for Plaintiffs to identify additional violations allegedly
committed by Defendants once inside Plaintiffs' residence.

the circumstances of a particular <u>Summers</u> detention during the execution of a warrant. Once again, however, an important consideration underlying <u>Muehler</u> was that the occupants of the home already were subject to an intrusion by virtue of the execution of a valid warrant, so that any additional intrusion upon the occupants' privacy interests through detention or the use of "correctly applied handcuffs" was relatively modest in comparison to the governmental interest in minimizing the risk of harm to the officers and the occupants while the warrant was being executed.  See <u>Muehler</u>, 544 U.S. at 99-100, 125 S. Ct. at 1470-71.  The balance must be struck differently here, where the initial intrusion into Plaintiffs' home was unlawful.

Moreover, the <u>Muehler</u> Court emphasized that the search in that case was not "ordinary," but instead was conducted pursuant to "a warrant authoriz[ing] a search for weapons and a wanted gang member [who] reside[d] on the premises."  544 U.S. at 100, 125 S. Ct. at 1470-71.  More generally, the Supreme Court has emphasized that a Fourth Amendment excessive force determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1872.

Here, these considerations would not support anything beyond the most modest degree of force.  Because the suspected armed robber was already in custody, the

28

Defendant troopers and the other members of the raid team had no reason to believe that anyone on the premises posed a particular threat to the safety of the officers or others. Indeed, there was no ground for suspicion that anyone within Plaintiffs' home had any involvement in the armed robbery that triggered the search; rather, this search was predicated only on the assertion that the suspect "sometimes stay[ed]" at Plaintiffs' home, so that there was some purported reason to suspect that the suspect might have stored some of the evidence of his crime at this residence. In addition, the Court already has noted the absence of any evidence that any Plaintiff behaved in a way that would have triggered any concerns for the safety of the officers or others on the premises.

Under these circumstances, the case law indicates that handcuffs and drawn weapons would be excessive. In Bennett v. City of Eastpointe, 410 F.3d 810, 837 (6th Cir. 2005), for example, the court noted its earlier holding that there was no basis for a pat-down search of the plaintiff youths in connection with a Terry stop, and then "easily conclude[d]" from this that the use of handcuffs during this stop was unlawful, where the pat-down search had not yielded any weapons or otherwise triggered any safety concerns, and where there were "no facts that would indicate that the youths attempted to flee or do anything else that would warrant this use of force."  More generally, the courts have recognized that it generally is unreasonable to employ handcuffs or train weapons upon individuals who are merely present during the raid of a home, but who are not suspected of any criminal activity, do not interfere in any way with the officers' efforts to search

29

and secure the premises, and do not otherwise act in a way that gives rise to safety concerns.  See, e.g., Jacobs, 215 F.3d at 773-74; Baker v. Monroe Township, 50 F.3d 1186, 1192-93 (3d Cir. 1995); McDonald v. Haskins, 966 F.2d 292, 294-95 (7th Cir. 1992).

Nonetheless, Defendants have identified two potential obstacles to an award of summary judgment to Plaintiffs on their claim of excessive force.  First, the pertinent record is not free from dispute.  As one example, Plaintiff Steve Elliot testified that he was handcuffed for nearly the entire duration of the search, but Defendants have cited the testimony of a state trooper that Mr. Elliot was handcuffed for only a brief period of perhaps two or three minutes.  Next, and as noted earlier, the record is not entirely clear as to the force employed by the two named Defendant troopers, as opposed to other members of the raid team.  Accordingly, only certain aspects of Plaintiffs' excessive force claim are capable of resolution as a matter of law under the present record; the precise extent of Defendants' liability must await determination in a future proceeding.

## IV.  **CONCLUSION**

For the reasons set forth above, as well as the reasons stated on the record at the

June 1, 2006 hearing,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' December 13,

2005 Motion for Summary Judgment is GRANTED IN PART, in accordance with the

Court's rulings in this opinion and order and at the June 1 hearing.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  June 28, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on June 28, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

31